UNITED STATES of America, ex rel. Robert A. DURCHOLZ, and Durcholz Excavating and Construction, Inc., Plaintiffs,

v.

FKW INCORPORATED and Jeffrey J. Strange, Defendants.

No. EV 95–121 C B/H.

United States District Court,
S.D. Indiana,
Evansville Division.

April 27, 1998.

---

Daniel M. Anderson, Schottenstein Zox & Dunn, Columbus, OH, Charles C. Griffith, Johnson Carroll & Griffith, Evansville, IN, John C. McDonald, Schottenstein Zox & Dunn, Columbus, OH, Michael D. Tarullo, Schottenstein Zox & Dunn, Columbus, OH, for Plaintiffs.

Maurice A. Byrne, Jr., Jeffersonville, IN, Jeffrey B. Kolb, Emison Doolittle Kolb & Roellgen, Vincennes, IN, Marsha C. Massey, Assistant U.S. Attorney, Office of the United States Attorney, Indianapolis, IN, R. Joseph Sher, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, Robert F. Stayman, Ziemer Stayman Weitzel & Shoulders, Evansville, IN, Ponce D. Tidwell, Jr., Ice Miller Donadio & Ryan, Indianapolis,

IN, Bradley L. Williams, Ice Miller Donadio & Ryan, Indianapolis, IN, for Defendants.

### ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BARKER, Chief Judge.

This motion comes before the Court on Defendants' Motion for Summary Judgment on Plaintiffs' False Claim Act ("FCA") claims, alleging that (1) Plaintiffs' claims are jurisdictionally barred, and (2) even if jurisdiction exists, neither Defendant violated the FCA.[1] For the following reasons, Defendants' Motion for Partial Summary Judgment is *GRANTED IN PART AND DENTED IN PART.*

### I. *PROCEDURAL HISTORY*

Plaintiff's complaint sets forth claims against Defendants Jeffrey J. Strange ("Strange") and FKW Incorporated ("FKW") for violating the FCA and tortiously interfering with Plaintiff's business relationship with the United States Government. In a February 25, 1998 Entry, this Court denied Plaintiff's Motion for Summary Judgment on the FCA claims and dismissed Plaintiff's tortious interference claim against Strange. *See United States ex rel. Durcholz v. FKW Incorporated,* 1998 WL 89659, No. 95–121–C–B/S (Feb. 25, 1998 S.D.Ind.). That Entry outlined the facts of this action in considerable detail. Therefore, we now discuss only those facts which are relevant to the instant motion.

### II. *BACKGROUND*

This case arises out of a government contract awarded to FKW to clear two sedimentation ponds at the Crane Navel Surface Warfare Center ("Crane") in Crane, Indiana. As an employee of the Navy's office of the Officer in Charge of Construction ("OICC"), Strange was assigned to serve as the government's contracting officer on the ponds project. Strange Depo., vol. 1, at 77. Strange's immediate supervisors were Lieutenant DeWayne Roby ("Roby") and Commander Larry Laws ("Laws"). *Id.,* vol. 2, at 170. Gerald Hill ("Hill"), the Deputy Director of the Public Works Directorate, and David Smith ("Smith"), Support Division Director for the Engineering Field Activity (supervisor of the OICC), also were Strange's superiors with important roles in the project. Hill Aff. ¶ 1; Smith Aff. ¶¶ 3–4.

Recognizing the need for an expedited effort to clear the ponds, a consensus developed among Crane officials that dredging should be used to complete the project because it was quicker than conventional excavation, which was the traditional alternative. Laws Aff. ¶ 4; Hill Aff. ¶¶ 5–7. Although dredging was the method that the government preferred, using non-prepriced items to support the delivery order would invariably slow the process.[2] Laws Aff. ¶ 21. Therefore, Strange requested and received authorization from Smith to use conventional excavation ("conventional") line items listed in the UPB to price the project so long as the delivery order was issued as a "performance specification."[3] D.Smith Aff. ¶ 8, 11. Indeed, if the delivery order was issued as a performance specification, Smith instructed Strange that he could use line items from the UPB which support *any* method of completing the project. *Id.* ¶¶ 8, 11.

In November 1994, Strange *informally* requested FKW to submit a proposal on the

---

1. Hereafter, the Court will refer collectively to Relators/Plaintiffs Durcholz and Durcholz Excavating and Construction, Inc. as Plaintiff.

2. Typically, a project is priced by reference to the government's Unit Price Book ("UPB"). The UPB sets forth specific, pre-set prices for many basic items which the contractor might be called upon to provide during the course of the contract. Plaintiff's Exhibit 2 at 11–13. A task which does not appear in the UPB is referred to as a "non-prepriced" item. Plaintiff's Exhibit 2 at 11. In the instant case, the items and services necessary for conventional excavation had preset prices listed in the UPB, while similar items for dredging were non-prepriced.

3. A performance specification calls for the completion of a certain objective, but does not specify the method to be used to perform the work. If the delivery order is issued as a performance specification, the government may still express a preference for a particular method, but it cannot require the contractor to use that method. D.Smith Aff. ¶ 9.

project. Strange Depo. at 134; Frederick Depo. at 27; Plaintiff's Exhibit. FKW determined that it would use a subcontractor to perform the project and therefore began soliciting bids from various government-approved subcontractors. Plaintiff's Exhibit 3; Frederick Depo. at 39. Knowing that the government wanted the project performed by dredging, FKW indicated to potential subcontractors that it preferred dredging bids. Frederick Depo. at 40; Bex Depo. at 115. Pursuant to FKW's request for bids, Durcholz Excavating and Construction submitted the lowest dredging bid ($271,700) and Midwest Dredging and Excavation ("Midwest") submitted the second-lowest dredging bid ($369,800).[4] Frederick Depo. at 59–61.

Brian K. Frederick ("Frederick"), FKW's supervisor of operations at Crane in 1994 and 1995, knew that Durcholz submitted the lowest dredging bid.[5] Frederick Depo. at 190–91. Strange's superiors knew the prices of the various subcontractor bids, but believed that Durcholz's bid was only for conventional excavating and not dredging. Roby Depo. at 83.[6] Strange and Dale Bex ("Bex")[7] told FKW that it preferred Midwest and, consistent with that preference, FKW selected Midwest and not Durcholz.[8] Frederick Depo. at 61. It is undisputed that FKW was not required to select the lowest dredging bid. D.Smith Depo. at 77.

FKW submitted its formal written proposal for the project in the amount of $457,810 on December 22, 1994. Strange's Exhibit 8.

FKW priced its proposal by reference to attached conventional line items, but the figure was really based primarily upon Midwest's bid. Frederick Depo. at 69; Strange Depo., vol. 2, at 208. Roby, Strange, and Bex knew and approved of FKW's use of conventional line items, knowing that the proposed price was actually based on Midwest's bid. Roby Depo. at 99, 112. FKW's proposed price was higher than both the government's and FKW's original estimates. Frederick Depo. at 64; Strange Depo. at 182–83. Following Strange and Bex's direction, FKW supported the increase in price by adding a conventional line item for gravel for a road from the ponds up to the containment site. Frederick Depo. at 64. However, since Midwest planned to use dredging, neither the road construction nor the other conventional line items would actually be performed. *Id.* at 64.

Thereafter, Bex concluded that FKW's proposal was reasonable. Bex Depo. at 65. Strange and Bex then held a negotiation session with FKW, at which they accepted FKW's proposed price without modification.[9] Strange's Exhibit 9; Bex Depo. at 67; Frederick Depo. at 81. Following the session, Strange wrote a post-negotiation memorandum which stated that non-prepriced items for the project amounted to $2,817. Strange's Exhibit 7; Strange Depo. at 186.

On December 27, 1994, Strange completed the delivery order for the project in the

4. Durcholz offered to perform the project by either dredging or conventional excavation.

5. What Strange knew is disputed. Frederick testified that he and Strange had a meeting and "it was understood [by those in attendance] that Durcholz was dredging and conventional." Frederick Depo. at 191. Strange, however, testified that he did not know that Durcholz's bid was for dredging. Strange Depo. at 176–78.

6. In fact, Roby was given the mistaken impression that Durcholz's bid was not for dredging when, in a meeting attended by Strange, Frederick, Jerry Stomp (Frederick's assistant), and Dale Bex (civilian employee in the Navy's Public Works Directorate), someone told him that Durcholz was a conventional excavator and no one present disagreed. Roby Aff. ¶ 45.

7. Bex worked with Strange on the project as a representative from the Navy's public works di-

rectorate in a position similar to Strange's. Notably, Bex was not Strange's superior.

8. FKW's reason for selecting Midwest is disputed. Frederick testified that FKW would have selected Durcholz but for coercion from Strange. Frederick Depo. at 83. Specifically, Frederick testified that Strange threatened to withhold future Crane business from FKW unless it selected Midwest. Frederick Depo. at 77–78. Strange, however, denies ever making such a threat to FKW. Strange Depo. at 89.

9. Roby approved of Strange's decision to accept FKW's proposed bid despite operating under the mistaken belief that Midwest's bid had been the lowest dredging bid submitted. Roby Depo. at 95.

amount of $457,810.[10] Hill Aff. ¶ 10. Acting on behalf of Laws, Hill instructed Strange not to issue the order until Stan Armstrong ("Armstrong"), a representative from the Crane Army Ammunition Activity ("CAAA"), approved the price.[11] *Id.* After Hill advised Armstrong that the relevant government officials on the project recommended approval of the delivery order's price, Armstrong gave his approval and the order was issued. *Id.* at ¶ 10.

Midwest proceeded to perform the project by dredging. The government, however, rejected FKW's first submitted invoice because it was supported with attached conventional line items which for obvious reasons had not been performed. Frederick Depo. at 121. Roby, Jim Riggins (a supervisory civil engineer for Crane), and Strange all directed FKW to submit future invoices with the percentage of work completed and the amount due, without attached line items. Strange Depo. at 199–200; Frederick at 121. FKW re-submitted its first invoice, consistent with the Navy's instructions, and it was paid. Frederick Depo. at 123. The remaining five FKW invoices were submitted and paid in similar fashion. *Id.* at 123–24; Plaintiff's Exhibits 11, 13.

Believing that its bid had been improperly rejected, Durcholz began investigating the contracting process and allegedly verified his suspicions through, among other things, private conversations with Frederick, FKW's supervisor of operations of Crane. Durcholz Depo. at 97, 99–100, 103–104. Durcholz informed Laws of the possibility of a civil suit and sent Laws a letter dated January 30, 1995, alleging that FKW had been forced to use Midwest even though Durcholz's bid was substantially lower. Frederick Depo. at 95–96; Plaintiff's Exhibit A. Approximately one week later, on February 5, 1995, Laws held a meeting with various government officials and with Frederick in an effort to investigate the possibility of fraud. Frederick Depo. at 95–96. This litigation ensued.

### III. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med. Ctr. v. American Med. Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994).

In resolving a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movants. *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 366 (7th,Cir.1997); *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992). However, we must not "ignore facts in the record merely because they are unfavorable.... [A non-movant] gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question." *Patel,* 105 F.3d at 366. Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enters. Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

### IV. DISCUSSION

**A) JURISDICTION**

■ As a threshold matter, Defendants contend that we lack jurisdiction to hear this

---

10. Strange typed the delivery order onto a standard order form, which contained the statement, "[a]ll work to be performed in accordance with JOC specifications & attached line items." Plaintiff's Exhibit 10. Despite the fact that dredging would be used, conventional line items were attached to the delivery order. *Id.*

11. The CAAA is the office that was actually paying the bill on the project. However, it used the OICC to procure and complete this project.

matter, citing the False Claims Act at 31 U.S.C. § 3730(e)(4)(A), which states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media unless the person bringing the action is an original source of the information.

Defendants characterize Plaintiff's allegations as being based upon public disclosures for which Plaintiff is not an original source. This argument as explained below is unavailing.

▪ "An aim of the Act is to encourage 'private individuals who are aware of fraud being perpetrated against the Government to bring such information forward,' H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986); in accordance with this goal, this section permits only that insider/'whistleblower' to maintain the *qui tam* action." *Hindo v. Univ. of Health Sciences,* 65 F.3d 608, 612–13 (7th Cir.1995) (emphasis in original). The Act's jurisdictional bar will be raised "only when each and every component of this section is present." *Id.; see also United States ex rel, Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1409 n. 9 (9th Cir.1995). "A qui tam plaintiff may not bring an action based upon publicly disclosed allegations or transactions unless the plaintiff was an 'original source' of the information." *United States ex rel. Houck v. Folding Carton Administration Committee,* 881 F.2d 494, 504 (7th Cir.1989).

We first address whether Plaintiff's allegations were previously publicly disclosed. Defendants contend that Plaintiff's allegations were publicly disclosed when (1) Frederick discussed the allegations at a February 7, 1995 meeting, (2) Frederick discussed the allegations with Durcholz in private conversations, and (3) Strange received multiple documents pursuant to Freedom of Information Act ("FOIA") requests. Plaintiff rejoins that Frederick's disclosures at the February 7th meeting and in private conversations

with Durcholz were not "public disclosures" under the Act.

The Seventh Circuit in *Hindo, supra,* made it clear that private communications among private parties are not "public disclosures" under the Act. *Id.* at 613. Accordingly, Frederick's private conversations with Durcholz would not qualify as such.

Plaintiff also received various documents related to the project from the government through FOIA requests. His first such request, made in a letter dated February 8, 1995 to Laws, sought all documents relating to the pond project. Strange Exhibit 16. Courts have considered documents released pursuant to FOIA requests to constitute "public disclosures" under the Act. *See United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1520 (9th Cir.1995), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); *United States ex rel. Burns v. A.D. Roe Co., Inc.,* 919 F.Supp. 255, 257 (W.D.Ky.1996); *United States ex rel. Eitel v. Reagan,* 898 F.Supp. 734, 739 (D.Or.1995). Although the documents that Durcholz received through his FOIA requests are relevant to this action and provide supporting evidence for his allegations, the principle allegations of fraud were not disclosed in those documents. *See United States ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 653 (C.A.D.C.1994.) ("the Act bars suits based on publicly disclosed 'allegations or transactions,' not information"). Accordingly, the allegations cannot be construed to have been "based upon" the FOIA disclosures.

▪ Finally, Defendants maintain that the February 7th meeting was an "administrative investigation" under Section 3730(e)(4)(A) and therefore disclosures at that meeting constituted public disclosures. The meeting was conducted by Laws, the minutes of which were furnished to Durcholz pursuant to a FOIA request. Frederick Depo. at 97. During that meeting Frederick testified that he had been instructed to select Midwest and to change FKW's proposal to represent Midwest's bid, plus FKW's overhead and profit. *Id.* at 96. There were also discussions concerning the fact that FKW's proposal utilized conventional line items from the UPB,

whereas it was generally acknowledged by all that the project was being performed by dredging. *Id.* at 98. Whether the February 7th meeting constitutes an "administrative investigation" under the Act is unclear. The meeting was not pursuant to a formal inquiry and apparently was not a public proceeding; (Frederick was the only non-government employee in attendance and he was there as a witness). The meeting, however, seemed to be a preliminary examination into the alleged improprieties in the bidding process, suggesting that the term "investigation" may apply.[12]

Assuming the disclosures at the February 7th meeting were public disclosures, jurisdiction nevertheless exists because Durcholz qualifies as an "original source." An "original source" is defined in the Act as "an individual who has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B); *see also United States ex rel. Houck v. Folding Carton Administration Committee,* 881 F.2d 494, 504 (7th Cir. 1989). Durcholz has "independent" knowledge since he knew of the information on which his allegations were based absent any public disclosure. *Houck, supra; United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3rd Cir.1991). He has first hand knowledge of the nature of his own bid and obtained additional information from private conversations with Frederick—conversations which were initiated as part of Durcholz' own investigation into the selection of the subcontractor for the pond project. Indeed, the evidence indicates that these conversations occurred prior to any public disclosures. Durcholz' January 30, 1995 letter to Laws, in which he alleged that Frederick had been forced to select Midwest as the subcontractor on the project, preceded the February 7th meeting and any release of documents pursuant to his FOIA request. (Strange's Exhibit 16). Durcholz's first-hand

knowledge, coupled with his own investigation of the process, evidences his "independent" knowledge. *See United States ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 657 (C.A.D.C.1994).

"Direct" signifies "marked by absence of an intervening agency." *Id.* at 656. Durcholz more than satisfies the "direct knowledge" requirement because he gained his knowledge through his involvement as an unsuccessful bidder and his independent investigation into the process. *See id.; Cooper ex rel. United States v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562, 568 (11th Cir. 1994) (finding "direct knowledge" when relator acquired information through three years of his own research prior to public disclosure); *United States ex rel. Long v. SCS Business & Tech. Institute,* 1998 WL 151290, No. CIV. A. 92–2092 (March 26, 1998 D.D.C.). Similarly, the Seventh Circuit in *Houck on Behalf of U.S. v. Folding Carton Admin. Committee,* 881 F.2d 494, 504 (7th Cir.1989), held that the plaintiff's knowledge of fraud by a committee processing a class action settlement was "direct" because he learned of the information upon which the claim was based "as a result of his involvement in assisting late claimants in recovering money out of the settlement order funds."[13] *Id.* at 505. Durcholz was such an original source, thus raising the jurisdictional bar for this action.

This result is consistent with the purposes of Section 3730(e)(4). In enacting the jurisdictional bar to the FCA, Congress sought to discourage "opportunistic" or "parasitic" suits by strangers to the alleged wrongdoing, seeking to take advantage of allegations already in the public domain. *Quinn, supra* at 651; *United States ex rel. Barth v. Ridgedale Electric, Inc.,* 44 F.3d 699, 702 (8th Cir.1995). Durcholz clearly is not a stranger to the events underlying this action and does not represent the type of opportunistic litigant

---

**12.** Although it is unclear whether the contents of the February 7th meeting were publicly disclosed by the meeting itself, they clearly were publicly disclosed once Strange's FOIA request for the meetings' minutes was satisfied. *See United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d at 1520.

**13.** "Section 3730(e)(4)(B) does not require that the qui tam relator possess direct and independent knowledge of *all* of the vital ingredients to a fraudulent transaction." *Quinn, supra* at 656 (emphasis added).

that Congress sought to bar when it enacted Section 3730(e)(4). Accordingly, Defendants' Motion for Summary Judgment for lack of jurisdiction is *DENIED.*

## B) THE MERITS OF PLAINTIFF'S FCA CLAIMS

■ Turning to the substantive issue in this case, the FCA imposes liability on one who "knowingly presents" to the United States government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a). "No proof of specific intent to defraud is required." 31 U.S.C. § 3729(b); *see also Brooks v. United States,* 64 F.3d 251, 255 (7th Cir.1995). For purposes of this section, "knowingly" means the person (or entity):

(1) had actual knowledge of the falsity of the information at issue;

(2) acted in deliberate ignorance of the truth or falsity of that information; or

(3) acted in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b). "Innocent mistakes or negligence are not actionable under this section." *Hindo v. Univ. of Health Sciences,* 65 F.3d 608, 613 (7th Cir.1995). In short, the false claim must be a lie. *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992).

■ Some courts recently addressing the issue have also required that the falsity or fraudulent conduct be material. *See United States ex rel. Berge v. Trustees of Univ. of Alabama,* 104 F.3d 1453, 1459 (4th Cir.1997); *United States ex rel, Rabushka v. Crane Co.,* 122 F.3d 559, 563 (8th Cir.1997); *Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 55 (1993); *United States v. Data Translation, Inc.,* 984 F.2d 1256, 1266 (1st Cir.1992); *United States ex rel. Butler v. Hughes Helicopter Co.,* 1993 WL 841192, No. CV 89–5760 (Aug. 25, 1993 C.D.Cal.) *aff'd* 71 F.3d 321 (9th Cir.1995). Although the Seventh Circuit has not yet addressed the issue, we believe such a requirement is appropriate and consistent with the FCA. *See United States ex rel. Lamers v. City of Green Bay,* 998 F.Supp. 971 (E.D.Wis.1998). To satisfy the materiality requirement, the falsity must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Berge, supra* (citations omitted); *see also United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

■ In some cases, the government's knowledge is a defense to a FQA claim. *See United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 817 (9th Cir.1995); *United States ex rel. Milam v. Regents of the Univ. of California,* 912 F.Supp. 868, 888–89 (D.Md.1995). "The knowledge possessed by officials of the United States may be highly relevant. Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." *United States ex rel. Hagood v. Sonoma Cty., Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991). "In essence, the defense suggests that the 'knowing' submission of fraudulent claims is logically impossible when responsible government officials have been fully apprised of all relevant information." *United States ex rel. Lamers v. City of Green Bay,* 1998 WL 117884 at * 18, No. 95–C–684 (E.D.Wis. March 13, 1998). However, most courts have not held the government's knowledge to be an automatic bar to a FCA claim. *See Hagood, supra; United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1156 (2nd Cir.1993); *Tyger Construction Co. Inc. v. United States,* 28 Fed.Cl. 35, 59–60 (1993); *but see Boisjoly v. Morton Thiokol, Inc.,* 706 F.Supp. 795, 810 (D.Utah 1988). Instead, the relevance of the government's knowledge is to be determined on a case-by-case basis. *See e.g. United States v. Fiske,* 968 F.Supp. 1347, 1352–53 (E.D.Ark.1997). "The extent and nature of government knowledge may show that the defendant did not 'knowingly' submit a false claim." *Butler, supra* at 321; *see also X Corp. v. Doe,* 816 F.Supp. 1086, 1093–94 (E.D.Va.1994). Conversely, the government's knowledge may be too incomplete or come too late in the process to defeat the "knowingly" element. *See United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 442 (E.D.N.Y.1995).

Plaintiff claims that Strange violated the FCA when he (1) knowingly submitted a fraudulent delivery order for the project, and (2) conspired with FKW to overcharge the government on the project. Plaintiff claims that FKW violated the FCA when it (1) knowingly submitted a fraudulent proposal for the project that resulted in the government being overcharged, (2) knowingly submitted fraudulent invoices on the project, and (3) conspired with Strange to overcharge the government on the project.

Defendants move for summary judgment on all Plaintiff's FCA claims, maintaining that they did not violate the FCA because (1) the claims were not false or fraudulent, (2) the government knew and approved of the claims at issue, and (3) any falsity was immaterial.

### 1. Strange's Issuance of the Delivery Order

At the heart of this litigation is Plaintiff's contention that Strange engaged in a fraudulent course of conduct that caused the government to approve the delivery order. Defendants respond that (1) Strange's conduct was not fraudulent, (2) the government was fully informed of Strange's conduct, and (3) any fraudulent conduct was immaterial.

■ The False Claims Act "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. McLeod,* 721 F.2d 282, 284 (9th Cir.1983) *quoting United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968). "[T]he statute is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a fraudulent course of conduct that causes the government to pay a claim for money." *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 439 (E.D.N.Y.1995); *see also Hindo v. Univ. of Health Sciences,* 65 F.3d 608, 613 (7th Cir.1995).[14] To prevail, Plaintiff must demonstrate that Strange's conduct amounted to a "purposeful scheme ... to defraud ... the government." *Hindo, supra.* "Innocent mistakes or negligence are not actionable." *Id.*

■ The first issue is whether a reasonable jury could conclude that Strange's conduct constituted a purposeful scheme to defraud the government into approving the price in the delivery order.[15] As one of the government's principal representatives on the project, Strange was heavily relied upon to represent the government's best interests and provide his superiors, most notably Roby, Laws, and Hill, with pertinent information regarding the project.[16] Providing

14. Defendants cite an unpublished opinion from the District of South Carolina for the proposition that the FCA applies only when a claimant makes a false statement or submits a false record in order to receive payment; not those situations in which the claimant engaged in fraudulent course of conduct in order to receive payment. *See United States ex rel. Harrison v. Westinghouse Savannah River Co.,* No. 1:94–2332 (D.S.C. Dec. 23, 1997.). Although that court acknowledged contrary authority, it ultimately rejected it, based on *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 938 F.Supp. 399, 404–05 (S.D.Tex.1996). Recently, however, the Fifth Circuit vacated the district court holding that *Harrison* relied upon. *Id., affirmed in part, vacated in part, United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899 (5th Cir.1997). We do not find *Harrison* persuasive. Indeed, we are bound by the Seventh Circuit's decision in *Hindo,* 65 F.3d at 613, which holds that purposeful schemes to defraud the government into paying a claim are actionable under the FCA even if the claim is not literally false. *Id.; see also United States ex rel. Pogue v.*

*American Healthcorp, Inc.,* 914 F.Supp. 1507, 1511 (M.D.Tenn.1996); S.Rep. No. 345, 99th Cong., 2d Sess. 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 ("each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim").

15. The government's approval of the delivery order caused it to pay invoices submitted pursuant to that order. *See United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 439 (E.D.N.Y.1995) (separate invoices submitted for payment on contract obtained through "rigged" bidding process constitute fraudulent claims).

16. Although Smith was the supervisor of the OICC, he was stationed at Great Lakes Navel Center in Great Lakes, Illinois. D.Smith Aff. ¶ 3. His job involved advising field offices regarding specific contracts and actions. *Id.* at 4. There is

his superiors with such information was essential in order for them to make fully informed decisions regarding the project and to properly evaluate Strange's recommendations and actions.

Construing the evidence in the light most favorable to Plaintiff, as we must, a reasonable jury could find that Strange purposefully withheld important information regarding the project from his superiors. Frederick testified that Strange was informed very early in the process that Durcholz, not Midwest, had submitted the lowest dredging bid for the project.[17] Frederick Depo. at 190–91. The record demonstrates that Strange withheld this information from his superiors, never informing them that Midwest's bid was nearly $100,000 more than Durcholz's bid. Hill Aff. ¶ 10; Strange Depo., vol. 2, at 171; Roby Depo. at 105.[18] In fact, Roby testified that Strange may have been the one who expressly misled him, causing him to believe that Durcholz's bid was for conventional excavation only and not dredging. Roby Aff. ¶ 45. Unaware that Durcholz's bid was for dredging, Strange's superiors continued to believe that Midwest's bid constituted the lowest dredging bid submitted. Roby Depo. at 83.

Frederick also testified that Strange tampered with the selection process by threatening to withhold future Crane business from FKW unless it selected Midwest.[19] According to Frederick, FKW would have selected Durcholz but for Strange's threat. Strange withheld this information as well from his superiors, allowing them to believe that FKW selected Midwest voluntarily, without his interference.

It is undisputed that Strange also used a complex pricing system to document estimates and proposed prices for the project.[20] This system created some confusion over the basis of the delivery order price, which Strange compounded by misleading explanations. For example, when Hill asked why FKW's proposed price was significantly higher than the government's original estimate, Strange responded that the government had miscalculated the amount of gravel necessary for the project's haul road. Strange Depo. at 182–183. Strange, however, failed to clarify that no haul road would actually be built since the project would be performed by dredging; the need for more gravel was simply a fiction to justify the increase in price. *Id.;* Frederick Depo. at 66. Strange even conceded in his deposition that his answer to Hill's question was "possibly misleading." *Id.* at 183.[21]

no indication that he normally would have been informed of the particulars of a contract as it proceeded through procurement.

17. Without citing to the record, Defendants argue that Roby had the same knowledge about the subcontractor bids as did Strange. Supporting Plaintiff's allegation that Strange knew of Durcholz's lower dredging bid is Frederick's testimony that Strange was in a meeting where "[i]t was understood that Durcholz was dredging and conventional." (Frederick Depo. at 191). Frederick testified that Roby was not at that meeting, creating a genuine issue of fact regarding whether Roby and Strange had the same knowledge about the bids.·

18. Defendants argue in their Reply Brief that Strange was justified in coercing FKW into selecting Midwest because it was not definite that Durcholz would perform by dredging, whereas Midwest would absolutely perform by dredging. This argument is meritless. Durcholz's bid clearly was for dredging or conventional excavation, whichever FKW preferred. There is no evidence that Strange believed that Durcholz's bid was indefinite or that he ever expressed such a concern to FKW.

19. Frederick also testified that Roby made a similar threat. Frederick Depo. at 188–89. However, construing the evidence in the light most favorable to Plaintiff, Roby made his threat without knowing that Durcholz's bid was the lowest dredging bid submitted, whereas Strange made the threat knowing that Midwest's bid was close to $100,000 more than the lowest dredging bid submitted. A reasonable jury could infer that Strange's act was fraudulent because he knew that it would result in an inflated price tag for the project, whereas Roby believed that he was trying to get FKW to select the lowest dredging bid. · ·

20. Strange's use of conventional line items to price the project was authorized by Smith. D.Smith Aff. ¶ 8.

21. Strange also used his position as a government representative to approve the Midwest-based price. Pursuant to government regulations, Strange was required to negotiate with FKW on the project's price tag. Rather than attempt to negotiate FKW's proposed price downward, Strange accepted the proposed price without any true negotiation, knowing that the

Although Strange's acts individually may not each constitute fraud, a reasonable jury could conclude that the totality of his acts, taken in context, violate the FCA. A reasonable jury could infer that Strange (1) knowingly manipulated the bidding process and withheld crucial information from his superiors in order to create the impression that the delivery order price was based on the lowest dredging bid submitted and on FKW's choice of bids; (2) used a complex pricing method and provided Hill with a misleading explanation in order to make it difficult for his superiors to verify the reasonableness of the delivery order's price and to increase their reliance of Strange's recommendations; (3) knew that FKW's acceptance of Midwest's bid would result in an over-billing of the government, but nonetheless coerced FKW into selecting that bid and then approved FKW's proposed price without any real negotiation. Based upon these inferences, a reasonable jury could conclude that Strange engaged in a purposeful scheme to defraud the government.

▄ Next we address whether Strange's fraudulent conduct was material to the government's decision to approve and pay on the delivery order. Defendants maintain that the conduct was immaterial because price was not a major factor in the government's decision to approve the delivery order. Plaintiff rejoins that the price of the project was a key consideration in the government's decision making process, fully capable of influencing the government's decision to approve the delivery order.

Strange's alleged fraudulent conduct was obviously material to the government's decision to approve the price of the delivery order. Defendants' position would have this Court hold that the price of the delivery order and the government's ability to obtain a lower price for the same type of work were irrelevant to whether it approved the delivery order. Such a conclusion would be contrary to the evidence and common sense. The whole bid approval process is premised on and emanates from the centrality of pric-

ing. Hill demonstrated the importance of price when he delayed the issuance of the delivery order until Armstrong approved the price tag. Hill Aff. ¶ 10. Armstrong gave his approval only after Hill informed him that all the responsible government officials involved recommended approving the price. *Id.* Although the government was willing to pay a higher price for dredging, there is no indication that it was willing to pay over $100,000 more for Midwest's dredging instead of Durcholz's dredging. Strange's fraudulent conduct clearly had "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States ex rel. Berge v. Trustees of Univ. of Alabama,* 104 F.3d 1453, 1459 (4th Cir.1997); *see also United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Accordingly, Strange's alleged fraudulent conduct was material, and Defendants' Motion for Summary Judgment on Plaintiff's claim that Strange issued the delivery order in violation of the FCA is therefore *DENIED.*

▄ Plaintiff also contends that Strange's issuance of the delivery order with the knowledge that the project would be performed by dredging constituted a *false* claim because the delivery order expressly required "[a]ll work to be performed in accordance with JOC specifications and attached [conventional] line items." Defendants rejoin that any falsity was immaterial. On this, we agree with Defendants. The government clearly wanted the project to be performed by dredging and anticipated as much. The delivery order's statement that the project be performed by conventional excavation did not cause the government to approve the delivery order. (Roby Aff. ¶ 49). On the contrary, if anything, the language would have dissuaded the government from approving it. Therefore, any falsity was immaterial in that it did not affect the government's decision to permit the issuance of the delivery order. *See Berge,* 104 F.3d at 1459 (materiality is a question of law for the court).

price was based on a bid which was approximately $100,000 more than the lowest dredging

bid submitted.

Moreover, Strange did not "knowingly" submit a false claim because all the responsible government officials knew that the project would be performed by dredging, not conventional excavation. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs claim that the delivery order violated the FCA because it included a false statement is *GRANTED*.

### 2. *FKW's Proposal and Invoices Did Not Violate FCA*

Plaintiff also alleges that FKW violated the FCA by (1) submitting its proposal with attached conventional line item when it was actually based on Midwest's bid, and (2) submitting invoices based on an inflated price. Defendants rejoin that FKW's actions were (1) not false or fraudulent, (2) carried out pursuant to the government's direction, and (3) immaterial to the government's decision to pay out claims.

Could a reasonable jury find that FKW's proposal or invoices violated the FCA? Assuming that FKW submitted its proposal and invoices in the manner alleged by Plaintiff, it is nevertheless clear that those actions did not violate the FCA. "Far from an instance of deceit and skullduggery," *Hindo*, 65 F.3d at 614, FKW's actions were authorized by the Navy, known and approved of by the responsible government officials, and carried out without knowingly misleading the government.

### a) *FKW's Proposal Did Not Violate the FCA*

 FKW's proposal was neither false nor fraudulent. The record clearly establishes that the relevant government officials knew and approved of the fact that the project would be performed by dredging and that its price would be documented with conventional line items. Indeed, Smith authorized the use of conventional line items to document the project's price at the beginning of the process. Accordingly, the use of conventional line items to document its proposed price was not, by itself, improper.

Plaintiff, however, contends that FKW falsely represented that its proposed price was arrived at by reference to conventional line items. FKW does not dispute that it came up with its proposed price by taking Midwest's bid and adding its standard profit and overhead coefficient, and then manipulated the conventional line items to support that figure. According to Plaintiff, this procedure deceived Strange's superiors into believing that FKW's proposed price was consistent with the conventional excavation prices listed in the Unit Price Book. The result, according to Plaintiff, was that the government approved FKW's proposed price on the mistaken belief that the price was consistent with conventional excavation pricing.[22]

FKW's methods and motivations notwithstanding, it is fully apparent that the government was not deceived by FKW's proposal. The relevant government officials, including Roby, Strange, and Bex, knew that the proposal was based on Midwest's bid even though it was documented with conventional line items. In fact, FKW submitted its proposal with conventional line items, consistent with Strange and Bex's expressed preference.

Plaintiff's position also misconstrues what the attached conventional line items represented. The decision to use the line items was made in order to hasten the process, not to ensure that the project's price would reflect the cost of completing the project by conventional excavation. Indeed, the government knew that dredging was more expensive than conventional excavation and decided early on that it was willing to pay the additional expense for dredging. There is no evidence that any government official expected the project's price to be governed by the

---

**22.** Plaintiff argues in his response brief that "FKW caused false claims to be presented for payment by proposing the cost of work based upon Midwest's price plus FKW's cost coefficient when it had received a bid to have the same work performed in the same manner, at a substantially lower cost, by a subcontractor which FKW considered at least as qualified as the high- cost subcontractor." These allegations do not constitute a FCA violation. FKW was not required to select the lowest dredging bidder and opted to select a higher bidder for a very legitimate reason: two representatives from its customer, the Navy, directed it to do so. The government then had the option to reject FKW's proposal, which it declined to exercise.

actual price of conventional excavation or that the conventional line items would be used to arrive at the project's price. Rather, the conventional line items were used simply to support the arrived at price. To arrive at a reasonable price for the project, it was logical for FKW to begin with the cost of paying its subcontractor and then add its profit and overhead. Once FKW calculated those figures and arrived at a proposed price, Strange and Bex directed FKW to correlate. that price with conventional line items. In short, FKW submitted its proposal based on Midwest's bid and supported it by conventional lines with the government's knowledge and pursuant to the government's instructions.[23]

b) *FKW's Invoices Did Not Violate the FCA*

 Plaintiff also contends that "[o]nce FKW had obtained the contract at an inflated price, the subsequent invoices presented for payment all constitute 'false claims.'" Plaintiff's Response Brief at 10.

Although the invoices could be considered false claims if the fact-finder concludes that Strange deceived the government into approving the project's price, (*see United States v. Incorporated Village of Island Park*, 888 F.Supp. 419, 439 (E.D.N.Y.1995)), FKW nevertheless did not violate the FCA because it did not "knowingly" submit them as false claims. There is no evidence that FKW knew of Strange's alleged fraudulent scheme to defraud the government. It is undisputed that FKW believed that the government, through Strange and Bex, knew that Midwest's bid was $100,000 more than

the lowest dredging bid, but there is no evidence that FKW knew that Strange withheld that information from his superiors. FKW did not know that Roby directed it to use Midwest without knowing there had been a much lower dredging bid submitted. There is no evidence that FKW knew what Strange was communicating to his superiors or what possibly misleading explanations he was giving them about the pricing. In short, if the project's price was fraudulently enhanced, there is no evidence that FKW knew it.

 Plaintiff argued in his Motion for Summary Judgment that FKW's invoices were false because the first invoice had attached conventional line items, while the remaining invoices listed the percentage of work and the amount due, without any attached line items. Perhaps recognizing that the argument lacks merit, Plaintiff does not reargue this position in his Response Brief. What is worth noting, however, is that the invoices were submitted in accordance with the government's instructions. Throughout the project, FKW was instructed to price the project with attached conventional line items, while the project would be performed by dredging.[24] Consistent with the government's actions and direction, FKW's first invoice was submitted with attached conventional line items.[25] The government, through Riggins, Roby, and Strange, then instructed FKW to begin submitting its invoices with the percentage of work completed and the amount due, without any line items. Strange Depo., vol. 1, at 199–200; Roby Aff. ¶¶ 48–49.[26] FKW thereafter submitted its invoices

**23.** FKW's proposed price was higher than its original estimate (presumably because the subcontractor bid selected was higher than anticipated). The estimate was documented with conventional line items and the government directed that the proposed price be similarly documented. In order to adjust for the increase in price, FKW added conventional line items for road construction. Plaintiff contends that this made the proposal false because "the line items which were added were a fiction because no road needed to be built for a dredging project." (Plaintiff's Response Brief). The same could be said for all the conventional line items. The government, however, authorized the use of conventional line items to document the price, knowing that all the conventional line items were fiction. Therefore,

FKW's use of road construction line items to document the price increase from its estimate was not false.

**24.** Throughout the project, government officials based all of their proposals and orders on conventional line items: the initial proposal to FKW, the final price, and the delivery order.

**25.** The first invoice was nevertheless immaterial because it was not paid by the government.

**26.** Although these invoices may have violated procedures by not attaching the performed items, a failure to adhere to agency policy, without more, does not violate the FCA. *See United States*

consistent with those instructions. Clearly, the government was not deceived by FKW actions. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claim that FKW violated the FCA by submitting its invoices is *GRANTED*.

### 3. *Strange and FKW Did Not Conspire to Defraud the Government*

■ Finally, Plaintiff alleges that Strange and FKW conspired to defraud the government by agreeing to select Midwest's bid and use conventional line items to support FKW's proposed price when it was actually based on Midwest's bid. Defendants move for summary judgment on this claim, maintaining that (1) the responsible government officials were fully informed of the parties actions, (2) Strange and FKW did not have an agreement, and (3) even if they did, the agreement did not constitute a purposeful scheme to defraud the government.

■ The False Claims Act provides liability for "[a]ny person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). Under this section, Plaintiff must show:

1. that defendant conspired with one or more persons to have a fraudulent claim paid by the United States,

2. that one or more of the conspirators performed any act to have such a claim paid by the United States, and

3. that the United States suffered damages as a result of the claim.

*United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir.1991); *United States ex rel. Long v. SCS Business & Tech. Institute*, 999 F.Supp. 78 (D.D.C.1998); *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824, 828 (S.D.N.Y.1986) *aff'd.* 817 F.2d 1007 (2d Cir. 1987). "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir.1988); *see also Murphy*, 937 F.2d at 1039 (applying elements to FCA conspiracy claim). To prevail on his FCA conspiracy claim, Plaintiff must establish that Strange and FKW shared the conspiratorial objective. *Murphy, supra.*

Evidence of the alleged agreement to defraud consists of testimony that Strange coerced FKW into selecting Midwest and that Strange, as one of the government's principal representatives, directed FKW to submit its proposal with conventional line items when the proposal was actually based on Midwest's bid.[27] Although FKW followed Strange's orders in both instances, there is no evidence that it knew that Strange's superiors mistakenly believed Midwest submitted the lowest dredging bid. Frederick Depo. at 190–91. According to the evidence adduced thus far, as far as FKW knew, the government was fully informed of the nature of FKW's actions. The evidence shows that FKW was simply following orders from one of the government's principal representatives, without knowing that those acts might be serving a scheme by Strange to defraud the government. Frederick even testified that FKW's purpose in selecting Midwest was simply to appease Roby and Strange in order to maintain Crane as a customer, not to defraud the government. To be sure, there is no evidence that FKW performed the agreed upon acts in order to deceive the government into approving the delivery order. *See United States v. Murphy*, 937 F.2d

---

*ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478–79 (9th Cir.1996).

**27.** Whether FKW and Strange even had an agreement is unclear. First, FKW was coerced into selecting Midwest; it did not voluntarily agree to do so. *See MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F.3d 967, 980 (7th Cir.1995) (recognizing economic coercion as a defense to a civil conspiracy claim). Second, FKW used conventional line items in its proposal at Strange's direction. Strange was the government's agent and FKW had every reason to believe that Strange's directive constituted an order from the government. Nevertheless, even if the parties did agree to these actions, there is no evidence that FKW made such an agreement in order to defraud the government.

at 1039; *United States v. Incorporated Village of Island Park*, 888 F.Supp. 419, 443 (E.D.N.Y.1995) (must establish agreement to defraud the government).

Moreover, a reasonable jury could not conclude that the agreed upon acts constitute fraudulent conduct. If the alleged conspiratorial agreement included all of the deceitful conduct in which Strange allegedly engaged, then it might suffice to establish an agreement to defraud. However, in this situation, the two acts were not in and of themselves deceitful or misleading, since the government knew that Midwest was selected and that FKW's proposed was based on Midwest's bid. As such, they were not fraudulent. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claim that FKW and Strange conspired to defraud the government is *GRANTED*.

## V. *CONCLUSION*

For the aforementioned reasons, Defendants' Motion for Summary Judgment on jurisdictional grounds is *DENIED* because Plaintiff was an "original source," as that term is used in the FCA. Defendants' Motion for Summary Judgment on Plaintiff's claim that Strange violated the FCA by fraudulently inducing the government into approving the delivery order is *DENIED* because a reasonable jury could conclude that Strange engaged in a purposeful scheme to defraud the government. Defendants' Motion for Summary Judgment on Plaintiff's claim that Strange violated the FCA by issuing the delivery order with a false statement is *GRANTED* because the falsity was immaterial and the government was not deceived by it. Defendants' Motion for Summary Judgment on Plaintiff's claim that FKW violated the FCA by submitting its proposal with conventional line items is *GRANTED* because (1) the government knew and approved of the fact that FKW's proposal was based on Midwest's bid, and (2) the use of conventional line items was not deceitful. Defendants' Motion for Summary Judgment on Plaintiff's claim that FKW violated the FCA by submitting invoices on the project is *GRANTED* because (1) the government knew and approved of the invoices as submit-

ted, and (2) the alleged falsity was immaterial. Defendants' Motion for Summary Judgment on Plaintiff's claim that FKW and Strange conspired to defraud the government is also *GRANTED* because (1) there is no evidence that FKW's purpose was to defraud, and (2) the agreed upon acts were not fraudulent.