UNITED STATES of America, ex rel. Linda Gail PHILLIPS and Linda Gail Phillips, individually, Plaintiffs,

v.

PEDIATRIC SERVICES OF AMERICA, INC.; Harris Regional Hospital, Inc.; and PSA/HRH, L.L.C., Defendants.

CIV. No. 3:97CV360.

United States District Court, W.D. North Carolina, Charlotte Division.

March 15, 2001.

Thomas D. Roberts, Asheville, NC, for Linda Gail Phillips.

Frank D. Whitney, Kilpatrick Stockton, LLP, Charlotte, NC, for U.S.

Isaac N. Northup, Northup & McConnell, PLLC, Asheville, NC, for Pediatric Services of America, Inc. and PSA/HRH.

W. Bradford Searson, Van Winkle, Buck, Wall, Starnes & Davis, P.A., Dale Curriden, Asheville, NC, for Harris Regional Hospital, Inc.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the motions for summary judgment of De-

fendants Pediatric Services of America, Inc., Harris Regional Hospital, Inc., and PSA/HRH, L.L.C. The Plaintiff Linda Gail Phillips has responded in opposition to the motions. For the reasons that follow, the Court grants the Defendants' motions.

## I. PROCEDURAL HISTORY

Plaintiff brought this action in 1997 alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3129, *et seq.*, which prohibits the submission of false claims to the United States Government for payment. At issue in this case are claims for health care submitted for payment by Medicare. The Act provides that a "person may bring a civil action for a violation [of the Act] for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b). The Government may elect to intervene in the action; however, in this case it did not do so. Instead, the Government intervened only to oppose certain legal issues raised in the Defendants' affirmative defenses. Although it reserved the right to file *amicus curiae* briefs, none have been filed in connection with the motions for summary judgment and the Government has made no other appearances.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendants as the moving parties have the initial burden to show

a lack of evidence to support Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. FINDINGS OF FACT

Defendant Harris Regional Hospital, Inc. (Hospital) is a rural, non-profit, acute-care hospital located in Sylva, North Carolina, which provides medical services to the residents of Jackson County and the surrounding area. Exhibit 3, Affidavit of Mark Leonard, *attached to* Defendant Hospital's Motion for Summary Judgment, filed June 21, 2000 ["Hospital's Motion"]. In 1994, the Hospital began providing home oxygen services to its patients. *Id.* Because the Medicare regulations involving such care were complicated, the Hospital determined it would be more efficient to form a partnership with an organization already knowledgeable in that area. *Id.* In February 1995, the Hospital entered into a partnership with Pediatric Services of America, Inc. (PSA). *Id.* The partnership, known as PSA/HRH, L.L.C. (Partnership), did business as Westcare Home Medical (Westcare) under the terms and provisions of an Operating Agreement. *Id.* Under that agreement, PSA and the Hospital made equal contributions of capital to the Partnership and equally divided

any profits. *Id.* In addition, four managers were to run the business, two each from PSA and the Hospital. *Id.* Because PSA had the expertise of dealing with Medicare regulations, it was determined that PSA would provide to the Partnership all billing and collections services; and, in return, would receive, in addition to the profits described *infra*, a fee of six percent of the Partnership's gross billings. *Id.* This contract was renewed from time to time but was in effect during the period at issue. *Id.* As a result of this contractual arrangement, the Partnership did not directly submit invoices for payment to the Government because all billing was handled on its behalf by PSA through its Georgia headquarters. *Id.*

Linda Gail Phillips (Phillips) began working for Westcare in March 1995 as a customer service representative. Exhibit 1, Deposition of Linda Gail Phillips, *attached to* Hospital's Motion, at 11, 17. Her job responsibilities were to answer the telephone, take referrals, process paperwork and take inventory. *Id.* Her immediate supervisors were Steve Murtola and Sheila Ensley. *Id.* Early on, Phillips became concerned about the manner in which Westcare's Medicare claims were handled. *Id.*, at 22. When a patient qualifies for Medicare or Medicaid insurance, regulations require that a Certification of Medical Necessity (CMN) form be provided by the treating physician. *Id.*, at 142–45. When Phillips first began working at Westcare, she sent the CMN forms to the doctors' offices for their personnel to complete. *Id.* Because the physicians and their staffs frequently failed to complete the forms or unreasonably delayed completion, Westcare employees began to fill in the relevant information and then sent the completed form to the physician for his signature. *Id.* Phillips felt this procedure was illegal, although the information was reviewed by the certifying physician. *Id.* She expressed her opinion to Ensley.

Phillips testified that when information for the CMN forms was incomplete, Ensley would provide the missing information. *Id.*, at 22. Sometimes the medical tests which qualified a patient for oxygen treatment had been performed more than 30 days prior to date of the CMN, in contravention of Medicare regulations.[1] *Id.*, at 24. Other times, the dates were missing altogether. *Id.*, at 25.

When Westcare first opened, the Hospital sent a batch of CMN forms to the Partnership for services which had been rendered prior in time to the formation of the Partnership. *Id.*, at 25–29. Phillips did not review these but simply forwarded them to PSA headquarters. *Id.* About 50 of those forms were incomplete, causing PSA to send them back to Westcare for completion. *Id.* Some of the forms were inadequate because the patient's certification for treatment had not been renewed; other forms lacked complete information. *Id.* Phillips often had difficulty obtaining missing information from the Hospital, causing her to consult her supervisor, Ensley. *Id.* According to Phillips, Ensley was always able to obtain the missing information, leading Phillips to believe that she "made it up." *Id.* However, Phillips did not know what steps Ensley took to obtain the information and admitted that Ensley frequently told her she was going to the Hospital to look up information. *Id.* Phillips had a "suspicion" that Ensley "made up" dates on some of the CMN forms; other times, she saw Ensley make changes to the dates. *Id.*, at 31–32. "Quite a few"

---

1. The majority, if not all, of the purported irregularities stem from the provision of oxygen therapy to patients of the Hospital.

times, Ensley told Phillips that she had been unable to find any additional information and instructed Phillips to put down certain information. *Id.*, at 32, 33. When Phillips contested this practice, Ensley told her, "Well, everybody does it." *Id.*

Phillips discussed this situation with a co-worker, Anthony Myron. *Id.*, at 34. She told Murtola, her other supervisor, that the initial forms which came from the Hospital "were a mess" and he agreed. *Id.* She did not, however, tell Murtola that she suspected Ensley of fraudulent conduct.

In a few months, Westcare employees finished the completion of the CMN forms for the time period before Westcare began operating. *Id.*, at 35–39. However, Phillips continued to find problems with the manner in which new CMN forms were completed and in order to protect herself, sometimes made copies of such forms. *Id.* For example, Ensley continued to provide information which Phillips had been unable to find. *Id.*, at 40. Phillips suspected that Ensley would actually make up test results in order to qualify patients for Medicare benefits. *Id.* On other occasions, the diagnosis on the form did not specify lung disease and Ensley would tell her to "just put down COPD."[2] *Id.*, at 42. Phillips also suspected that a respiratory therapist at the Hospital named "Tracy" was providing false information because Ensley usually said she would call Tracy to get the necessary data. *Id.*, at 45. According to Phillips, on one occasion, Ensley said that she had "even forged doctors' names at the hospital."[3] *Id.*

Phillips spoke with Rachel Downey, a vice-president at the Hospital, about her concerns. *Id.*, at 43. Phillips told Downey

that the CMN forms were "just very messed up, a lot of information was missing, and she [Downey] told me she just wanted me to get it cleaned up." *Id.*, at 44. Phillips did not tell Downey that she thought false information was being added to the forms or that she suspected Ensley of illegal conduct. *Id.*

During her deposition, Phillips was questioned about copies of CMN forms which she kept. Phillips kept such copies when something on the form alerted her to a potential problem; however, she acknowledged that the form itself would not disclose whether a problem indeed existed. *Id.*, at 44–50. On the first form reviewed during the deposition, Phillips testified that the date of the physical examination which would qualify the patient for oxygen therapy was more than 30 days prior to the prescription for the therapy. *Id.*, at 45–50. According to Phillips, the dates had not been altered; however, the patient was not qualified to have Medicare pay for the service. *Id.* Phillips acknowledged that if the claim had been sent to Medicare, it had the right to refuse to pay the claim. *Id.* In that event, unless the patient had been forewarned that the treatment would not be covered under Medicare, Westcare had to assume the cost of the treatment; it could not bill the patient. *Id.* Phillips had no knowledge whether this CMN form was actually submitted to Medicare. *Id.*

A review of the document shows that the treating physician noted his examination of the patient on May 7, 1996, and his prescription for home oxygen treatment on June 7, 1996. Phillips Deposition Exhibit 1. The date of the last saturation test was April 24, 1996. *Id.* Thus, although the

---

2. Chronic Obstructive Pulmonary Disease. *Dorland's Illustrated Medical Dictionary* (28th ed.1994).

3. Like many of the conversations recounted by Phillips, this evidence would be inadmissible hearsay at trial.

saturation test was performed more than 30 days prior to the prescription for oxygen therapy, the physician examined the patient within 30 days of the test and in his opinion, determined the patient needed oxygen therapy. The physician also noted that lifetime oxygen treatment was necessary and he signed the CMN form on June 24, 1996. *Id.* Phillips testified that it was not unusual for the CMN form to be signed by the physician after the actual date that therapy began. Phillips Deposition, at 142–50. And, apparently this practice did not violate any Medicare regulations.

Phillips was also questioned about a copy of a document which she claimed provided proof that Ensley had gone to a patient's home to perform an assessment. Phillips had assumed that Ensley had performed an initial assessment to ascertain whether oxygen therapy was warranted, a procedure which, according to Phillips, Ensley was not authorized to perform. *Id.,* at 50–54. Unless the patient had a certain percentage of oxygen saturation, Medicare would not pay for the therapy. *Id.* According to Phillips, these assessments could only be performed by physicians. *Id.* However, after the initial assessment to qualify the patient for the treatment, Ensley routinely, and properly, went to patients' homes to check the oximeters. *Id.,* at 54. When asked if it was possible that Ensley was only performing a routine assessment, Phillips could not verify that the assessment was improper. *Id.,* at 55. Moreover, a review of another document concerning the same patient shows that a registered respiratory therapist measured the patient's saturation percentage on May 29, 1996, and obtained a qualifying measurement. Phillips Deposition Exhibit 2. Further, this document is a rental services contract for oxygen equipment, dated June 4, 1996, not a CMN form. Deposition Exhibit 1, *supra.*

Continuing the exploration of documents copied by Phillips, she was questioned about a patient from Florida who was treated in the emergency room of the Hospital. The "ER" physician did not authorize oxygen therapy. Phillips Deposition, at 57–60. Phillips called the patient's home to obtain information which might qualify him for the treatment and she advised the patient that Medicare was not likely to pay for oxygen therapy. *Id.,* at 60. This was in accordance with prescribed and proper Medicare procedures and Medicare was never billed for such a claim. *Id.* In fact, when questioned about other patients, copies of whose forms Phillips had kept, she did not know if the patients had agreed to make private payment for the therapy because they did not qualify for Medicare coverage. *Id.,* at 64.

Another copy kept by Phillips was a CMN form for the renewal of oxygen therapy which did not contain the date of physical examination. *Id.,* at 65–67. Because the form did not contain this date, Phillips suspected wrongdoing. *Id.* However, Phillips acknowledged that if the patient had been previously qualified by his physician for lifetime oxygen therapy, renewals are allowed without additional examinations. *Id.* In such a case, the form would have been properly completed and Phillips acknowledged that she was unaware of the facts surrounding the patient's situation. *Id.* In fact, a review of the document shows the physician first prescribed lifetime oxygen treatment in December 1992 and the CMN form at issue was renewed by the doctor on January 14, 1994. Phillips Deposition Exhibit 5.

In December 1995, a patient's sister called Westcare stating that his physician had prescribed oxygen therapy. Phillips Deposition, at 68. The patient's treating

physician, Dr. Gehring, was out of town at the time. *Id.*, at 68, 72. Ensley told Phillips that his partner, Dr. Martinez, had authorized the therapy. *Id.* When Phillips called Dr. Martinez' office, no one recalled the order. *Id.* Later, Dr. Gehring called Westcare to inquire why the oxygen therapy had been initiated. *Id.* Ensley had been under the impression that one or the other of these physicians had prescribed the therapy. *Id.* According to Phillips, Dr. Gehring was very upset that the therapy had been initiated without his order. *Id.* Medicare was not billed for this service and the therapy was discontinued. *Id.*

However, Phillips testified to another irregularity involving this patient. She claimed that Ensley and two other co-workers went to the patient's home to perform the initial assessment for the treatment. *Id.*, at 70. She testified that the co-workers told her Ensley had walked the patient around his home prior to performing the test in order to ensure that his oxygen saturation would be low enough to qualify for the therapy. *Id.* Phillips testified that one of the co-workers said, "Sheila, we might be seeing you behind bars." *Id.* Phillips did not report this information to anyone; and, she did not disclose it to Dr. Gehring when he telephoned the Westcare office. *Id.*, at 71. However, Phillips acknowledged that Medicare was never billed for the treatment and she did not know whether anyone had told the patient that Medicare would not pay for the service. *Id.*, at 75.

Deposition Exhibits 7 and 7A concerned a patient who came into Westcare with a prescription for oxygen therapy. *Id.*, at 78. Phillips testified that the patient's diagnosis was sleep apnea, which did not qualify for Medicare reimbursement. *Id.* When she began to tell the patient that Medicare would not pay for this treatment, Tracy Cogdill, one of the hospital's registered respiratory therapists (R.R.T.) who worked part-time at Westcare, told her to note that the patient had COPD. *Id.* Tracy Cogdill provided an affidavit in which she acknowledged telling Phillips to add COPD to the sleep apnea diagnosis because she had worked with this patient for many years and knew he had been diagnosed with that condition. Exhibit 4, Affidavit of Tracy Cogdill Satter, *attached to* Hospital's Motion. She also averred that before any claims were submitted to Medicare, a Westcare employee would verify the diagnosis and prescription with the physician. *Id.*

Phillips testified that Ensley's husband was acquainted with a patient who had not been able to obtain Medicaid reimbursement for oxygen therapy from a Westcare competitor. Phillips Deposition, at 82–83. Ensley and her husband, according to Phillips, went to the patient's home to perform an initial assessment and obtained a saturation reading which qualified him for Medicaid reimbursement. *Id.* As a result, the patient changed his treatment to Westcare. *Id.*, at 85. Phillips testified that the assessment should have been performed by a physician and stated that a hospital form somehow appeared in the file. *Id.*, at 83. Nonetheless, she did not know whether a claim was ever filed with Medicaid or whether Medicaid ever paid such a claim. *Id.*, at 85. Phillips believed that Ensley did something inappropriate to obtain such a saturation level. The document contains Phillips handwritten notation that Ensley's husband reported that the competitor did not know how to properly assess the patient. Phillips Deposition Exhibit 8. No CMN form is included among the documents.

Deposition Exhibit 12 is a CMN form certified by Dr. Provost, a physician described by Phillips as difficult. Phillips Deposition, at 91. When the CMN form

sent to the doctor was returned with an incorrect date, Ensley told Phillips to change the date rather than returning the form to the physician. *Id.* However, Phillips was unable to testify that the modification caused the patient to improperly qualify for Medicare benefits. *Id.,* at 93.

As to many of the copies made by Phillips, she was unable to articulate why she had done so, stating only that she had been suspicious of the information reported thereon. *Id.,* at 86–91; 99–101. For these documents, Phillips had no knowledge of whether any claims were ever submitted to or paid by Medicare. *Id.* One document had nothing to do with Medicare reimbursement; however, Phillips kept a copy of it in case the patient might want to file a complaint against Ensley. *Id.,* at 96. Phillips testified that on many of the documents, Ensley instructed her to make changes based on telephone calls made to the patient's physician. *Id.,* at 97–98. However, as to these cases, as well, the modification did not usually qualify the patient for Medicare reimbursement. *Id.*

Phillips has filed under seal several deposition transcripts. The contents thereof are discussed in such a manner as to avoid disclosing confidential patient information. Dr. Steven Queen treated an elderly patient suffering from pulmonary fibrosis and atherosclerotic disease with chronic angina and chest pain and in June 1996, prescribed oxygen therapy. Sealed Deposition of Steven Queen, M.D., at 15–20. Because of the scarring in the patient's lungs, there was a low level of oxygen which was relieved by the oxygen therapy. *Id.* This condition supports a diagnosis of COPD. *Id.* Despite the fact that he signed the CMN form authorizing the treatment, he could not find in his progress notes that a saturation reading had been obtained, although hospital records indicated that saturation levels had been obtained at various times during hospitalization. *Id.* However, it was noted that the patient's saturation level was obtained by a Hospital respiratory therapist on May 29, 1996, and this reading was listed on the CMN form which the physician signed. Queen Deposition Exhibit 6. This reading was less than 30 days prior to the prescription. *Id.* There is no indication in the record of the source of this form; *i.e.,* it is unknown whether the exhibit came from Dr. Queen's records or was produced from PSA records. The form, however, was properly completed.

This treatment was renewed in June 1997, but Dr. Queen testified that the CMN form had not been signed by him. Queen Deposition, at 21. He also testified that the copy of the form, Queen Deposition Exhibit 7, did not come from his records. *Id.*

Dr. Queen was questioned about another patient whom he saw once for his associate, Dr. Nixon. In July 1996, Dr. Nixon signed a CMN form for oxygen therapy which he had prescribed in January 1996. *Id.,* at 23. The patient suffered from congestive heart failure causing the lungs to fill with fluid, a condition much alleviated by oxygen therapy. *Id.* In August 1996, Dr. Queen signed a second CMN form for home oxygen therapy which he had prescribed in July 1996. *Id.,* at 23–24. This form had been pre-prepared before he signed the certification. *Id.*

Dr. Queen was also questioned about the fact that at times, the initial CMN form did not contain an order for ambulatory equipment; however, the form was subsequently changed, by someone other than Dr. Queen, to include such an order. *Id.,* at 27–29. This, he stated, was not uncommon because he relied on the home health care provider to alert him to the patient's movements around their home. *Id.* Thus,

he would later change the order to include such equipment. *Id.* He also testified that it was not unusual for patients' saturation tests to be performed by other health care professionals, such as the hospital respiratory therapists or home health care professionals. *Id.*, at 30. The fact that saturation test results were not reflected in his medical notes did not mean that such tests had never been performed. *Id.* Moreover, the fact that the CMN form was presented for his signature with a saturation test result that he did not perform personally, did not mean that such a test had not been performed. *Id.* In essence, the doctor relied on other health care providers.

Dr. Gallinger was also deposed and testified that his office does not keep copies of the CMN forms issued for patients. Sealed Deposition of Roy Paul Gallinger, M.D., at 17. As did Dr. Queen, Dr. Gallinger testified that treating physicians rely on saturation testing done by the cardiopulmonary department at the Hospital or at Westcare. *Id.*, at 25. Although not done exclusively by Westcare, it was routine to have the patient's testing done there. *Id.*, at 26.

Dr. Gallinger also testified about the patient diagnosed with sleep apnea discussed by Phillips during her deposition. Dr. Gallinger prescribed oxygen therapy for the patient for night use only. *Id.*, at 28–30. However, his partner, Dr. Nash, was actually the patient's treating physician and knew the patient had a history of COPD. *Id.* As a result, Dr. Gallinger did not find it unusual or inappropriate that the CMN form presented to Dr. Nash showed a diagnosis of COPD or that it was signed by that physician. *Id.*, at 28–31.

Dr. Gallinger knew Sheila Ensley both as a patient in his practice and from her work as a registered respiratory therapist at the Hospital and later at Westcare. *Id.*, at 36–37. He testified that the respiratory therapists at the Hospital "play a vital role in treating our patients. They educate our patients in a lot of treatments, and I would say that it's weekly or more [that he had contact with them]." *Id.*, at 39. "They are really the people we talk to, more so than nurses, when it comes to oxygen and breathing treatments." *Id.*, at 40. Westcare has always had respiratory therapists on its staff. *Id.*, at 71. Dr. Gallinger explained that some patients are qualified for Medicare reimbursement for oxygen if their saturation level drops upon exertion. *Id.*, at 44. Thus, the saturation level at a resting rate might be deceptive. *Id.* During the period of time at issue in this action, it was not unusual for Dr. Gallinger to receive CMN forms from Westcare which had some of the information already completed. *Id.*, at 46. He reviewed these forms for clinical correctness; however, he did not conduct his own investigation to ascertain if a saturation level was accurate. *Id.* Moreover, there were times when, after he had signed a CMN form, he received further information from the home health care provider that the patient needed additional services, such as ambulatory oxygen equipment. *Id.*, at 60. On some occasions, he would verbally modify his prescription so that the CMN form would comply with the patient's needs. *Id.*, at 60–61. On those occasions, a Westcare employee would note the modification on the CMN form although it had already been signed.

Dr. Gehring, who was also deposed, reiterated much of Dr. Gallinger's testimony, including the fact that at the time period in issue, it was not unusual to receive CMN forms which had already been filled out. Sealed Deposition Paul Gehring, M.D., at 16–20. Counsel asked Dr. Gehring about a particular patient whose hospital record showed a saturation level of 91 percent on

May 10, 1996.[4] Plaintiff's Exhibit 37, *attached to* Gehring Deposition. The CMN form signed by Dr. Gehring, however, noted that on the same date, the patient's level was at 87 percent and was measured at the Hospital. Plaintiff's Exhibit 40, *attached to* Gehring Deposition. Dr. Gehring testified that saturation levels could easily have varied from 91 percent to 87 percent within a matter of hours. Gehring Deposition, at 39. Therefore, the fact that two different readings were obtained on the same date was not surprising to him. *Id.*

Ronnie Sloan was the director of cardiopulmonary services at the Hospital during the time period at issue. Sealed Deposition of Ronnie Sloan, at 6. From January 1995 through December 1996, there were 19 respiratory therapists working in the cardiopulmonary department at the Hospital. *Id.*, at 7. All of these therapists were authorized to administer oxygen saturation tests and oximetry tests to patients. *Id.*, at 8. These therapists were also authorized to administer ABG studies.[5] *Id.*, at 9. Because the tests are non-invasive and simple to perform, a wide range of medical personnel are qualified to administer them. *Id.* Tracy Cogdill was a staff respiratory therapist who was credentialed as a registered respiratory therapist and a certified respiratory therapist. *Id.*, at 12. Betty Mathis was another staff therapist holding the same credentials. *Id.*, at 13.

Susan Dignan has been the general counsel for PSA since January 1996. Sealed Deposition of Susan Dignan, at 5. She acknowledged that during the time period at issue, there was "sloppy record keeping at Westcare." *Id.*, at 25. As a result of the fact that the actual billing was being done at PSA instead of at Westcare, sometimes the original CMN forms along with the supporting test results were found in the files at PSA headquarters. *Id.* This was complicated by the fact that as to some patients, Westcare did not keep a copy for their files. *Id.* As a result, Dignan had to put together the files from PSA and Westcare in order to provide information to Phillips' attorney. *Id.* However, when oxygen therapy was initially ordered, Westcare was required to submit to Medicare not only the CMN form but a copy of the test results as well. *Id.*, at 27. If this was not done, Medicare would not pay. *Id.*

Phillips testified that she received only one performance evaluation at Westcare which occurred about four months after she began work there. Phillips Deposition, at 104–05. Phillips wrote on the evaluation that she felt Westcare should become more efficient in its paperwork. *Id.* She did not make any complaints about inappropriate billing.

In April 1996, Phillips was counseled about her job performance. *Id.*, at 106–07. The Employee Counseling Form, dated April 4, 1996, contains notations of complaints about Phillips telephone etiquette. Phillips Deposition Exhibit 19. There were six complaints of rudeness on the telephone, one from the Director of Home Health Care, and others from patients. *Id.* The cardiopulmonary staff complained about Phillips' inability to fill out the CMN forms. *Id.* One patient's wife complained that Phillips had called her a liar and threatened to leave the company if she had to deal with Phillips again. *Id.* Among other complaints was the giving of incorrect information about billing to a patient. Phillips Deposition Exhibit 20. The hospice coordinator complained that Phillips told her a hospice patient's equipment was

4. In order to qualify for Medicare, the saturation level must have been at 88 or below.

5. Arterial blood gases study. *Dorland's, supra.*

not a priority. *Id.* Two physicians complained that she was rude and questioned their orders. *Id.* And, finally a notation indicated that staff had complained of Phillips' "unnecessary harassment" and threatened to resign if the problem was not corrected. *Id.* As a result, Phillips and Ensley worked out a "Negotiated Plan of Action" providing for a 90 day period of probation during which any complaint from staff or a patient could result in termination. Deposition Exhibit 19, *supra.* Despite the fact that Phillips' signature appears next to this warning, Phillips testified that Ensley added this language after the interview. Phillips Deposition, at 108–09. Phillips then testified that she signed the form because Ensley told her to do so. *Id.* However, on the form itself, Phillips wrote that she had "signed as read but do not agree with what is above." Deposition Exhibit 19, *supra.*

In late May 1996, Westcare continued to receive complaints about Phillips' performance. Because of her failure to relay information to technicians, a patient referred from Macon County Hospital did not receive treatment. Phillips Deposition Exhibit 21. The Hospital determined that no future referrals would be made to Westcare. *Id.* In addition, another patient complained of Phillips' rudeness when they came into Westcare with a prescription. *Id.* Phillips told the patient that they did not qualify for Medicare reimbursement. *Id.* In June 1996, Phillips was terminated during a meeting with Ensley and Judy Green. Phillips Deposition, at 115. The only reason given to Phillips was that she questioned too many doctors' orders, she had been rude and complaints had been received about her. *Id.*

After her termination, Phillips spoke at length with Steve Murtola, who supervised the Sylva office from Asheville. *Id.*, at 118–20. She told him that Ensley had

hired her son and husband, but the son basically did no work. *Id.* She told him about a contract that Ensley had obtained for the Hospital which was never disclosed to Murtola. *Id.* She also advised him that there were some CMN forms for which Westcare would never get paid because they did not comply with Medicare regulations. *Id.* But, she acknowledged that she "didn't go into no (sic) big detail about the CMNs, no." *Id.*, at 120.

Dignan testified that Phillips was terminated because of complaints about her attitude by staff, failure to follow company procedure, and complaints from physicians and hospital employees. Sealed Dignan Deposition, at 75. In October 1997, Steve Murtola was terminated from PSA for improper and unprofessional conduct. *Id.*, at 83. Murtola had been involved in three affairs with PSA employees which caused dissension among the staff. *Id.* Other than this conduct, Murtola had been a good employee who was well acquainted with his job. *Id.*, at 84. Sheila Ensley was terminated in 1997 for misappropriation of funds and falsification of records. *Id.*, at 87. Ensley falsified time sheets and travel and expense reports. *Id.* An investigation was conducted which showed she had claimed reimbursement for personal clothing and received pay for vacation time. *Id.*, at 90. She also promoted her son without authority to do so. *Id.*

Phillips was also questioned during her deposition about the allegations of her complaint. When asked if she knew whether Westcare represented to Medicare that tests were performed at the hospital, when in fact they were not, she responded, "Well, that's what I don't know for sure," and acknowledged that this allegation represented only her suspicion. Phillips Deposition, at 129. She also could not say that CMN forms were inappropriately completed by Westcare employees

because "the physician would sign it when it was filled out." *Id.,* at 131.

## IV. DISCUSSION

Phillips' claims under the False Claims Act fall into four categories: (1) the knowing presentation of false or fraudulent claims to the United States Government; (2) the knowing falsification of records in order to get false or fraudulent claims paid by the Government; (3) conspiring to defraud the Government by getting false or fraudulent claims paid; and (4) retaliatory discharge for lawful actions taken in furtherance of an action under the False Claims Act. She also has alleged a common law claim for wrongful discharge.

### A. Phillips' evidence of Medicare procedures

■ Phillips' causes of action are based on the premise that Westcare and its employees violated regulations controlling the method by which and circumstances under which claims may be submitted to Medicare for durable medical equipment, *i.e.,* home oxygen therapy. In the brief opposing summary judgment, counsel argues that Medicare authorizes reimbursement for home oxygen therapy only when a claim shows the following items:

1. a medical examination conducted within 30 days prior to the initial oxygen set-up in the patient's home;

2. which results in a diagnosis of a condition of hypoxemia in a chronic stable state and a severe lung disease or hypoxia-related symptoms which may improve with oxygen therapy;

3. a qualifying arterial blood gas or pulse oxygen saturation test administered 30 days prior to the prescription showing a blood arterial PO2 at or below 55 mm Hg or a saturation at or below 88 percent, under resting conditions or oth-er medical evidence justifying the therapy;

4. a certification that the above tests were administered by the patient's treating physician or by a qualified supplier; and

5. the CMN form verified by that treating physician.

Plaintiffs' Consolidated Response in Opposition to Defendants' Summary Judgment Motions, including Memorandum Brief, filed July 14, 2000, at 2–3 ["Plaintiffs' Response"]. However, Phillips has placed before the Court no admissible evidence of the actual Medicare requirements, rules or regulations. Although reference is made several times to the Medicare Carrier's Manual, no portion thereof has been attached to the pleadings.

> Medicare provides health insurance for those over 65. Medicare pays for durable medical equipment if prescribed by a doctor as medically necessary. A doctor can prescribe such equipment by filling out a certificate of medical necessity, setting forth the beneficiary's diagnosis and the duration of the need for the equipment. A beneficiary or the doctor can take the certificate of medical necessity to a supplier who provides the equipment to the beneficiary within a day or two.

*Jackson v. United States,* 1998 WL 661460 *1 (E.D.N.Y.1998). Medicare regulations provide that it will pay for medical and other health services furnished by providers if the physician certifies that the services are medically necessary, the certification is signed by a "physician, nurse practitioner, . . . or physician assistant who has knowledge of the case . . . at the time the services are furnished or, if services are provided on a continuing basis, either at the beginning or at the end of a series of visits. Recertification of contin-

ued need for services is not required." 42 C.F.R. § 424.24(f).

The undersigned has reviewed each piece of evidence presented by the parties and finds, based on that review and the allegations of the complaint, that Phillips' contentions fall into the following categories:

 1. the Defendants' knowingly presented false or fraudulent claims for Medicare payment by

 a. allowing arterial blood gas and/or oxygen saturation tests to be performed by Westcare and/or Hospital respiratory therapists in contravention of conflict of interest rules; [6]

 b. presenting CMN forms to Medicare which had been pre-prepared by Westcare employees and later signed by physicians;

 2. The Defendants knowingly made false records or statements in order to get false or fraudulent claims for payment paid by

 a. presenting CMN forms to Medicare on which the diagnoses had been altered or supplied by Westcare employees;

 b. presenting CMN forms to Medicare on which additional information had been added by Westcare employees after signature by the physician;

 c. falsifying the dates of examinations and testing; and

 d. reporting saturation test results obtained after improperly exercising patients.

**B. Knowing presentation of false claims and knowing falsification of records**

The elements of a cause of action under 31 U.S.C. § 3729(a)(1), are (1) the knowing

presentation, (2) of materially false or fraudulent claims to Medicare for payment. *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784–85 (4th Cir.1999); *United States ex rel. Berge v. Board of Trustees of the University of Alabama,* 104 F.3d 1453, 1459 (4th Cir. 1997); *United States ex rel. Harrison v. Westinghouse Savannah River Co.,* 1997 WL 1040533 *1 (D.S.C.1997), *aff'd in part, rev'd in part,* 176 F.3d 776, *supra; United States v. Sforza,* 2000 WL 1818686 (S.D.N.Y.2000). In order to state a claim under 31 U.S.C. § 3729(a)(2), a plaintiff must show (1) that the defendant made a record or statement in order to get the Government to pay money; (2) the record or statement was false or fraudulent in a material manner; and (3) the defendant knew it was false or fraudulent. *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999).

"Knowingly" under the False Claims Act means that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; [however] [4] no proof of specific intent to defraud is required." *Harrison,* 176 F.3d at 785. "Materiality depends on 'whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.'" *Id.* (quoting *Berge,* 104 F.3d at 1459). The issue of whether the record or statement was materially false or fraudulent is to be resolved by the Court. *Berge, supra.*

The Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government. In order for a

---

**6.** This allegation suffers from the same problem as noted *infra.* Phillips has placed no evidence before the Court of those conflict of interest rules.

false statement to be actionable under the False Claims Act it must constitute a "false or fraudulent claim." "[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Therefore, a central question in False Claims Act cases is whether the defendant ever presented a "false or fraudulent claim" to the government.* Interpreting the last word of the phrase is fairly easy. The False Claims Act states that a claim "includes any request or demand ... for money or property" where the government provides any portion of the money or property requested. In other words, the False Claims Act at least requires the presence of a claim—a call upon the government fisc—for liability to attach. *Harrison,* 176 F.3d at 785 (quoting *United States v. Rivera,* 55 F.3d 703, 709 (1st Cir.1995)) (other citations omitted) (emphasis added).

During cross-examination at her deposition, Phillips was unable to testify that any one or more of the CMN forms at issue were actually presented to Medicare because Westcare's billing was handled by PSA at a different address. Moreover, she could not testify that any of the numerous CMN forms she copied were actually false or fraudulent. She admitted her lack of knowledge; and, her evidence was limited to speculation and suspicion. Phillips Deposition, at 86–91, 97–98, 99–101. Claims under the False Claims Act may not be based on speculation or conclusory allegations. *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997); *Mitchell*

*v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) (Conclusory allegations are insufficient to resist summary judgment.). Phillips has "provided no factual basis for [her] belief that defendants submitted [false] claims...." *Id.*

Moreover, much of Phillips' testimony involved documents unrelated to claims for Medicare coverage. Many of the documents she saved were Westcare purchase orders for durable medical equipment. The fact that purchase orders existed does not show that false claims for Medicare benefits were made. Others documents kept by Phillips were unsigned CMN forms which were never submitted. "[A] falsified signature on a form, not itself a claim for payment, not apparently required for payment, and not connected to substantive conditions required for payment, is not material ..." and does not qualify as a violation of the Act. *Harrison,* 176 F.3d at 789.

PSA's general counsel, Susan Dignan, was exhaustively questioned about Westcare's billing for specific patients; yet, copies of those bills were not attached to the transcript as exhibits.[7] Nor have they been presented in opposition to summary judgment. As to some of the patients, the Court was able to find CMN forms only by cross-referencing exhibits attached to other portions of the record. As to the remaining patients, Phillips has failed to place before the Court the actual bills, patient records or CMN forms. *See, e.g.,* Dignan Deposition, at 6–14. Thus, to the extent that Phillips bases her claims on these items, she has failed to refute the Defendants' contentions that these billings

---

7. The Court was not assisted in its review of the record by Phillips' counsel. Reams of exhibits and deposition transcripts were submitted under seal. The bills about which Dignan was questioned were not attached to her transcript. Nor did counsel direct the Court to the location of other patient information such as CMN forms which were attached to the depositions of other witnesses. This caused an inordinate amount of time to be spent by Court personnel to find those portions of the record.

were proper. Fed.R.Civ.P. 56; *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 416 (4th Cir.1999); *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 302 (4th Cir.1998) (If the plaintiff presents no evidence in opposition to summary judgment, it is appropriate.); *Daly v. Hunt*, 93 F.3d 1212, 1228 (4th Cir.1996) (If the plaintiffs fail to produce sufficient evidence, the district court shall enter summary judgment in favor of defendants.).

During her deposition, Dignan explained which CMN forms were actually submitted to Medicare, and which ones were not, and provided the reasons therefor. Dignan Deposition, at 14–15. For example, an unsigned CMN form was never actually submitted. *Id.* On other occasions, the CMN form may have been improperly or inadequately completed; however, Dignan explained it was not finished because the patient died or was discharged from treatment. *Id.*, at 15–18. In those situations, no claim was submitted. *Id.* Dignan also clarified that Medicare would not pay for an initial set-up of home oxygen therapy unless a copy of the saturation test report was attached to the CMN form. *Id.*, at 27. As a result, PSA always attached a copy of the report. *Id.* Thus, Phillips' allegation that false or fraudulent saturation test results were submitted to Medicare is speculation.

As to one patient, the claim submitted to Medicare requested payment for a time prior to the date on the CMN form. *Id.*, at 29–30. As a result, Dignan explained that Westcare had to make a partial refund to Medicare. *Id.* Thus, Phillips has failed to show that a false claim, as opposed to an inaccurate or mistaken one, was presented.

Another patient was initially certified for oxygen therapy. *Id.*, 30–31. Although later CMN forms were found, they were not signed by a physician and were never submitted to Medicare because Westcare had stopped billing the patient. *Id.* Dignan also clarified the situation involving the patient who was assessed by Ensley and her husband and who, as a result, transferred his business to Westcare. *Id.*, at 45–46. Phillips contended that it was inappropriate for Ensley to make the initial saturation level assessment and presumed that in order to obtain a qualifying reading, Ensley had exercised the patient prior to the test. However, that patient did not qualify for Medicare and therefore, no claim, false or otherwise, was ever submitted.[8] *Id.*

An elderly patient's CMN form correctly noted her saturation test results but identified the Hospital as the location of the test. *Id.*, at 47–48. Dignan thought it might have actually been performed at the rest home at which the patient was placed after her hospitalization. *Id.* In any event, the test result was correct. For another patient, the CMN form was properly filled out with the correct dates of examination and testing. *Id.*, 58–59. However, when the physician signed the certification, he inserted the incorrect date next to his name. *Id.; see also,* Exhibit 12, included in Sealed Materials *attached to* Defendants PSA and the Partnership's Reply to Plaintiffs' Response, filed July 27, 2000.

■ These billing situations are not examples of the presentation or making of false claims. Instead, they show the type of mistakes commonly encountered in the course of business. None of them, however, proves that Medicare was presented with a false or fraudulent claim or that the

---

8. Ms. Dignan actually testified that ''he wasn't Medicare...''. Dignan Deposition, at 46.

Apparently, the patient was not age qualified.

Defendants created false or fraudulent records or statements. At most, these incidents are evidence of "shoddy record keeping," as noted by Dignan herself. Phillips' allegations "amount to no more than allegations of poor and inefficient management.... [P]oor or ... 'non-cost-effective' management is not actionable under the False Claims Act." *Harrison,* 176 F.3d at 789. And, neither mistaken conduct nor negligence is actionable under the False Claims Act. *Hindo v. University Health Sciences/The Chicago Medical School,* 65 F.3d 608, 613 (7th Cir.1995). "Innocent mistakes or negligence are not actionable under" the Act; "the claim [at issue] must be a lie." *Id.; accord, United States v. Southern Maryland Home Health Services,* 95 F.Supp.2d 465 (D.Md. 2000).

Phillips contends it was against Medicare regulations for Westcare personnel to pre-prepare the CMN forms. However, no such regulation has been placed in the record. Phillips also testified that Ensley "filled in" missing information by making it up. However, as noted *infra,* the evidence shows this allegation is both incorrect and speculative. *See, e.g.,* Deposition Exhibits 2 and 5 *attached to* Phillips Deposition; Affidavit of Tracy Cogdill Satter. Dr. Queen testified that it was not uncommon for him to verbally modify the CMN form once signed because he relied on home health providers to alert him to a patient's needs. Queen Deposition, at 27–30. Nor was it inappropriate for saturation tests to be performed by the Hospital's respiratory therapists. *Id.; see also,* Gallinger Deposition, at 25–26. Moreover, Dr. Gallinger testified that some patients are qualified for home oxygen therapy under Medicare if their saturation level drops upon exertion. *Id.,* at 44. Thus, as to these patients, it would not be inappropriate for a respiratory therapist to exercise the patient prior to the test. *Id.*

From the voluminous exhibits reviewed by the Court, only two CMN forms were found which were not explained. One form, Phillips Deposition Exhibit 1, was certified by a physician although the saturation test was conducted more than 30 days prior to his prescription for home oxygen therapy. Assuming *arguendo* that this violated Medicare regulations, it appears to be nothing more than a mistake or negligence *on the part of the physician* who examined the patient within 30 days of the test but failed to prescribe the therapy within the same time. That, however, does not implicate the Defendants.

Dr. Queen testified that although he had originally prescribed oxygen therapy for a certain patient, he did not sign Queen Deposition Exhibit 7, which contained a signature, for renewal of the therapy. Phillips, however, has not shown that this CMN form was submitted to Medicare and Dignan testified that it was not.

Moreover, Phillips has not shown by direct evidence that the information supplied on the CMN forms when they were pre-prepared by Westcare employees was false. *United States v. Stelweck,* 108 B.R. 488, 494–96 (E.D.Pa.1989). She has not provided any direct evidence that the patients did not have the diagnoses supplied on the forms. *Id.* None of the physicians testified that the patients did not have a condition qualifying them for Medicare insurance. *Id.* The physicians testified instead, that on occasion they authorized the addition of information to the forms after signing. *Id.* Indeed, they testified it was customary at that point in time for the CMN forms to reach their offices for signature with the information already provided. While the physicians themselves may have violated some regulation, there is simply no admissible evidence that the Defendants presented or prepared false

records or statements. Phillips' "evidence amounts at most to a scintilla, which is insufficient.... At best, [Phillips] fails on her burden of showing materiality; at worst, she cannot even show the statements were false." *Berge*, 104 F.3d at 1462. Summary judgment is appropriate on a False Claims Act where the relator has "failed to make a showing on an essential element of [her] case with respect to which [she] had the burden of proof." *Id.* (citations omitted); *accord, Zahodnick v. Int'l Business Machines Corp.*, 135 F.3d 911, 913 (4th Cir.1997) (Summary judgment was appropriate in a False Claims Act where there was no evidence showing an intent to defraud.); *United States ex rel. Bennett v. Genetics & IVF Institute, Inc.*, 199 F.3d 1328, 1999 WL 978881 (4th Cir.1999). Such is the case as to these claims.[9]

## C. Conspiracy claim

█ Phillips' third claim under the Act is that the Defendants "conspire[d] to defraud the Government by getting a false or fraudulent claim allowed or paid...." 31 U.S.C. § 3729(a)(3). The general principles of civil conspiracy apply to this cause of action. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). To establish a civil conspiracy, Phillips must present evidence that the Defendants

> acted jointly in concert and that some overt act was done in furtherance of the conspiracy.... While [she] need not produce direct evidence of a meeting of the minds, [Phillips] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial ob-

jective. In other words, to survive a properly supported summary judgment motion, [Phillips'] evidence must, at least, reasonably lead to the inference that [the Defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

*Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir.1996) (citations omitted).

It is first noted that Phillips has failed to produce any evidence of the actual payment of a false or fraudulent claim. Nor has she produced any evidence of an agreement or mutual understanding to get false claims paid. Assuming *arguendo* that Ensley intentionally falsified records, there is no showing that the Hospital and PSA entered into an agreement with Ensley to defraud the Government. *Durcholz, supra.* Nor is there any evidence that Ensley conspired with anyone at the Hospital to falsify claims in order to obtain Medicare coverage. According to the physicians whose depositions Phillips presented, it was proper for Hospital employees Tracy Cogdill and Betty Mathis to administer saturation level tests, and Phillips has presented no evidence that any tests performed by these therapists were false. The physicians who improperly certified pre-prepared CMN forms testified that the information contained therein was correct; their patients were qualified to receive the therapy ordered. Nor were these doctors employed by the Defendants. And, if the physicians orally modified their CMN forms, that does not implicate any Defendant. "Of course, [Phillips] is not required to show an express agreement; conspiracies, by their very nature, are not often

---

9. Much argument is made by Phillips' counsel that the Defendants violated conflicts of interest regulations controlling Medicare. Not a shred of evidence, except argument and spec-

ulation, has been presented in opposition to summary judgment which is, therefore, appropriate.

susceptible to direct proof. To avoid summary judgment, however, [s]he must produce more than 'a whiff of the alleged conspirators' assent." ' *Id.,* at 546 (citations omitted).

[Phillips'] evidence did not disclose any communication between [Ensley or others] that might give rise to an inference of an agreement to commit any acts, wrongful or otherwise. Nor does [Phillips'] evidence give rise to an inference that each alleged conspirator shared the same conspiratorial objective. The problem with [Phillips'] evidence is not merely that each act alleged is capable of an innocent interpretation. Rather, the problem is that [Phillips'] evidence amounts to nothing more than rank speculation and conjecture.

*Hinkle,* 81 F.3d at 422.

In fact, it is unclear, with the exception of Ensley, whom Phillips claims participated in the conspiracy. Nor did she enlighten her employer at the time. Phillips admitted during her deposition that she never complained to any superior at Westcare or PSA about her suspicions against Ensley. Phillips Deposition, at 43–44, 34. Even after she was fired, Phillips held her countenance during a meeting with her highest superior, Steve Murtola. *Id.,* 118–20 (She "didn't go into no (sic) big detail about the CMN's, no."). Phillips' "circumstantial evidence was probative of a conspiracy only through speculation and the piling of inferences;" thus, summary judgment is proper. *Hinkle, supra.*

**D. Retaliatory discharge under the False Claims Act**

■ Title 31, United States Code, § 3730(h) "prevents the harassment, retaliation, or threatening of employees who assist in or bring *qui tam* actions." *Zahodnick v. IBM Corp.,* 135 F.3d at 914. Thus, in order to prove such a cause of action, "an employee must prove that (1)[s]he took acts in furtherance of a *qui tam* suit [i.e. engaged in 'protected activity']; (2)[her] employer knew of these acts; and (3)[her] employer discharged [her] as a result of these acts." *Id.*

Here, there is no evidence that [Phillips] initiated, testified for, or assisted in the filing of a *qui tam* action during [her] employment with [Westcare]. In fact, the record discloses that [Phillips] merely informed a supervisor of [difficulties with CMN forms which she characterized as being "in a mess"]; [s]he never informed anyone that [s]he was pursuing a *qui tam* action. Simply reporting [her] concern ... to [her] supervisor does not suffice to establish that [Phillips] was acting "in furtherance of" a *qui tam* action.

*Id.*

Moreover, assuming *arguendo* that Phillips engaged in protected activity by copying "suspicious" documents, she admitted that she never spoke to a supervisor of her belief that Ensley or others were engaging in false or fraudulent conduct. Nor did she ever report her suspicions to Medicare or any other governmental agency. Phillips Deposition, at 218. "Without evidence of any knowledge on the part of [her employer], [Phillips] cannot establish the necessary causal connection between the alleged protected activity and [her] termination of employment...." *Zahodnick, supra.*

Moreover, not unlike employment discrimination cases, Westcare has come forward with a legitimate explanation for Phillips' termination. There were numerous complaints about her from customers, hospital staff, physicians and co-workers. From the beginning of her employment, she questioned authority, kept secretive copies of "suspicious" documents and argued with supervisors over procedure.

More than several times she was accused of being rude, to the point of telling a hospice worker that an equipment order for a dying patient was "not a priority." This behavior alone justified her discharge.

### E. State retaliatory discharge claim

 Although not so denominated, Phillips asserts a claim for wrongful discharge in violation of public policy. This claim fails for the same reasons as the federal retaliatory discharge claim.

> As a general rule in North Carolina, an employee-at-will has no claim for wrongful discharge. Either party may terminate the employment relationship for any reason, or for no reason at all. There are limits, however, to the employer's ability to discharge an at-will employee. A valid claim for wrongful discharge exists when an at-will employee is discharged for an unlawful reason or in contravention of public policy.

*Lorbacher v. Housing Authority of the City of Raleigh*, 127 N.C.App. 663, 672, 493 S.E.2d 74, 79 (1997) (citations omitted). As noted above, there is no evidence in the record that Phillips "ever voiced her concerns publicly outside the employment setting, which would tend to indicate a public concern." *Evans v. Cowan*, 132 N.C.App. 1, 10, 510 S.E.2d 170, 176 (1999). Without such evidence, there is no nexus between her knowledge of a purportedly illegal scheme and her discharge; *i.e.*, "there [is] no forecast of evidence showing her statements were either the motivating or a substantial factor underlying her dismissal." *Id.*, at 11, 510 S.E.2d at 177. Speculation is insufficient. *Id.*

### V. ORDER

IT IS, THEREFORE, ORDERED that the Defendants' motions for summary judgment are hereby **GRANTED.** A Judgment is filed herewith.

## JUDGMENT

For the reasons set forth in the Memorandum and Order filed herewith,

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the Defendants' motions for summary judgment are **ALLOWED,** and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.